IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORAH GETZ, et al., | No. CV 07-6396 CW |
| Plaintiffs, | ORDER DENYING DEFENDANTS' MOTION TO DISMISS, LIFTING DISCOVERY STAY AND VACATING PROTECTIVE ORDER |
| v. | |
| THE BOEING COMPANY, et al., | |
| Defendants. | |

Defendant Honeywell International, Inc. moves to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction, arguing that Plaintiffs' claims are nonjusticiable under the political question doctrine. Defendants Boeing Company and Goodrich Pump and Engine Control Systems, Inc. have joined in Honeywell's motion. Plaintiffs Deborah Getz, Rodney Thomas, Mary Duffman, Sophia Duffman, Christine Vaughn, Brad Vaughn, Jill Garbs, Doug Garbs, Jordan Lanham, Jerry Goldsmith, RyAnne Noss, Timothy Brauch, Chris Trisko and Mark Daniel Houghton oppose the motion. Having considered all of the papers filed by the parties and the oral argument on June 19, 2008, the Court DENIES without prejudice Defendants' motion to dismiss.[1]

BACKGROUND

---

[1] At the hearing on June 19, 2008, the Court granted Defendants' motions to stay discovery and for a protective order pending its ruling on the jurisdictional question. Because the motion to dismiss for lack of subject matter jurisdiction is denied, these orders are hereby vacated.

On February 17, 2007, a United States Army Special Operations Aviation Regiment MH-47E Chinook helicopter bearing Tail #94-00472 crashed in the Zabul Province of Afghanistan. All twenty-two individuals on board the helicopter were military personnel. Plaintiffs are five survivors of the crash, one survivor's wife and the heirs of four service people who were killed. Defendants are companies that designed, assembled, manufactured, inspected, tested, marketed and sold the helicopter, its component parts and related software and hardware.

The following facts regarding the details of the crash are taken from the Army Regulation 15-6 Report of Proceedings by Investigating Office/Board of Officers (Army Report), attached as Exhibit A to the Brandi Declaration submitted in support of Plaintiffs' opposition. Included in this report are the findings of the Army's Investigative Office (Investigative Findings), as well as numerous attachments, such as aircraft maintenance reports, autopsy reports, weather forecasting data, voice transcripts of pilot communications, aircrew sworn statements and aircraft manual extracts. The Army Report is heavily redacted and uses a number of undefined abbreviations and terms.

The United States Army 160th Special Operations Aviation Regiment (SOAR), the unit operating the helicopter at the time of the crash, specializes in low-level night flying during combat and rescue missions. On the day of the accident, the unit was returning to its base in Bagram, Afghanistan along an "established flight corridor" with two other helicopters after a mission to "drop . . . off personnel to capture/kill someone in the al-Qaeda

2

network" was cancelled. Army Report, Investigative Findings, 3(b); Sworn Witness Statement taken at 11:09, at 1.[2] According to one eyewitness report, when the crew informed their commander that the mission had been cancelled and they were planning to return to base, the commander "agreed that [they] should recover to Bagram." Id., Sworn Statement taken at 14:30, at 1. The helicopter took off after a Performance Planning Card was completed, indicating that the aircraft could perform the mission, and the crew received two favorable weather forecasts. Id., Investigative Findings, 3(c); Sworn Statement taken at 14:30, at 1. Sixty-four minutes into the flight, the aircraft crashed, killing eight and injuring the remaining fourteen people on board. Id., Investigative Findings at 1(a), 2(e).

According to the Army Report, "the preponderance of evidence indicates that the primary cause of the accident was the sudden catastrophic failure of the number two engine." Id. at 1(c). The Army Report's Investigative Findings indicate that "the single remaining operational engine could not provide the power required to maintain sustained flight." Id. However, the MH47E Operator Manual suggests that continued flight may have been possible with only one working engine. Id., MH47E Operator Manual, section 9-2-7. According to the Army Report's findings, the pilot's decision to enter an "avoid" range of 400 feet, rather than to

---

[2] Because the Court's copy of the Army Report has no numbering system with which to identify each witness statement, the Court will use the time each interview was conducted to distinguish between the statements. Defendants use reference numbers for pages in the Army Report that do not appear in the exhibit submitted to the Court.

3

descend to a lower altitude, may have made continued flight impossible. Id., Investigative Findings, at 4(f)(2-3). The Army Report lists a number of possible reasons why the pilot did not descend to a lower altitude, including the fact that he "lost all primary instrumentation in the last few seconds of flight," that the "standby instrument displays [were] poorly located," and that he "had no visual references" because of poor weather conditions. Army Report, Investigative Findings, at 4.

Although the root cause of the helicopter's engine failure has not yet been determined, investigators have ruled out Foreign Object Damage (FOD). Id. at 3(f). Moreover, Army investigators found no evidence of friendly or hostile fire in the "relatively benign . . . valley" over which the helicopter was flying at the time of the crash. Id. at 3(a). Although the Army Report's Investigative Findings rule out icing damage as a possible cause of the accident, the witness reports uniformly mention seeing serious icing on the aircraft right before the crash. Id. at 3(e), Sworn Statement taken at 9:50, at 1 ("I turned my lip light on and discovered icing on the minigun"), Sworn Statement taken at 9:52, at 1 ("I noticed precipitation coming in from the window and trace amounts of icing on the lower FOD screen of the number two engine"), Sworn Statement taken at 10:00, at 6 ("Heavy/severe icing to the point of 'ghost' terrain painted on radar display").

The Army Report also lists several factors that may have contributed to the severity of the accident, including "a potential component and or system failure of the engine fuel system, poor weather (WX) forecasting and monitoring capabilities in

4

Afghanistan, . . . and improper pilot inputs." Id. at 1(c). Witness Reports focus especially on the failure of the weather forecasting in predicting what one passenger called "the worst weather conditions I have encountered in 20 years." Id., Sworn Statement taken at 10:00, at 6. The Army Report's Investigative Findings state that "the unforecast weather requirements were a significant contributing factor and had a profound impact on how the PIC [pilot in command] reacted to the situation." Id., Investigative Findings, at 4(b). The Investigative Findings reported no evidence, however, that "the inaccurate weather forecasts and observations were due to human error." Id. at 3(d).

There is no evidence that the mission was poorly planned or that the unit failed to maintain the equipment properly. Id. at 3(b),(g). The engine was only seven months old, and had shown no signs of weakness in any prior flight crew inspection. Id. at 3(g). However, there had been past reports of other engine failures on Chinook aircraft prior to this incident. Id. at 4(a)(1).

Alleging that the defective design and production of engine number two was the primary cause of the crash, Plaintiffs are seeking monetary damages from Defendants for wrongful death, bodily injuries, and loss of consortium based on the legal theories of negligence, strict product liability, and breach of express and implied warranty.

## LEGAL STANDARD

Dismissal is appropriate under Rule 12(b)(1) when the district court lacks subject matter jurisdiction over the claim. Fed. R.

5

Civ. P. 12(b)(1). Subject matter jurisdiction is a threshold issue which goes to the power of the court to hear the case. A federal court is presumed to lack subject matter jurisdiction until the contrary affirmatively appears. Stock West, Inc. v. Confederated Tribes, 873 F.2d 1221, 1225 (9th Cir. 1989).

A Rule 12(b)(1) motion may either attack the sufficiency of the pleadings to establish federal jurisdiction, or allege an actual lack of jurisdiction which exists despite the formal sufficiency of the complaint. Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730, 733 (9th Cir. 1979); Roberts v. Corrothers, 812 F.2d 1173, 1177 (9th Cir. 1987). In the latter circumstance, "the court holds broad authority to order discovery, consider extrinsic evidence, and hold evidentiary hearings in order to determine its own jurisdiction." Rosales v. United States, 824 F.2d 799, 803 (9th Cir. 1987).

EVIDENTIARY OBJECTIONS

In their opposition, Plaintiffs object to the evidence submitted by Defendants on the basis of lack of authentication, hearsay and lack of foundation. The Herman Declaration filed in support of Defendants' motion contains newspaper articles (Exs. 1, 3, 5-7), press releases (Exs. 2, 8), a 160th Special Operations Aviation Regiment media advisory (Ex. 4), a memorandum from the Placer County Board of Supervisors (Ex. 9), an Air Force casualty report (Ex. 10), biographical sketches published by the public affairs office of the 75th Ranger Regiment (Ex. 11-13), and a United States Department of State Fact Sheet (Ex. 14). All these exhibits, except exhibit ten, are inadmissible because they are

6

hearsay and lack foundation.

The Declaration of Marlin Kruse was also filed in support of Defendants' motion. Kruse, who states that he is a head engineer at Honeywell, declares that he saw first-hand the number two engine from the subject helicopter. Mr. Kruse's statement in paragraph twelve regarding information he heard from 160th investigators is hearsay and is inadmissible. His statement in paragraph thirteen that he could see grenade impact to the engine lacks foundation and is speculative, and is therefore also inadmissible. The remainder of his declaration will be considered.

## DISCUSSION

Defendants allege that Plaintiffs' claims raise a nonjusticiable political question over which the Court has no subject matter jurisdiction. In Baker v. Carr, the Supreme Court established six independent tests for determining whether a case involves a nonjusticiable political question. 369 U.S. 186, 217 (1962). A case may be dismissed on political question grounds if and only if "one of these formulations is inextricable from the case at bar." Id.

A political question is implicated when there is:

(1) a textually demonstrable constitutional commitment of the issue to a coordinate political department;

(2) a lack of judicially discoverable and manageable standards for resolving it;

(3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjusticiable discretion;

(4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

7

>      (5) an unusual need for unquestioning adherence to a political decision already made;
>
>      (6) the potential of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217.

Plaintiffs suggest that the Court apply a summary judgment standard to decide Defendants' Rule 12(b)(1) motion. Plaintiffs cite a Ninth Circuit medical malpractice case, Rosales, 824 F.2d at 803, which held that when "the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment." If the moving party then fails to meet the summary judgment standard, "the intertwined jurisdictional facts must be resolved at trial by the trier of fact." Id.

Plaintiffs argue that the Court should dismiss their claims only if Defendants establish that there are no material facts in dispute. This standard, however, cannot be applied to a political question dispute. A political question arises, by definition, when jurisdictional and substantive claims are "so intertwined" that the court will have to consider evidence regarding the jurisdictional issue at trial. Baker, 369 U.S. at 217. In order to decide whether a political question exists, the Court must determine if it can resolve all disputed facts without implicating one of the six Baker tests. Because Plaintiffs' proposed procedure would require the Court to evaluate any disputed evidence at trial, its adoption could result in the Court reviewing nonjusticiable claims. Thus, the Rosales procedure is not applicable to this case.

8

In order to determine whether a political question is implicated in this case, the Court must address the Baker tests by applying "a discriminating analysis of the question posed, in terms of the history of its management by the political branches, of its susceptibility in the light of its nature and posture of the specific case, and of the possible consequences of judicial action." Baker, 396 U.S. at 211-12.

I. Textual Commitment to a Coordinate Branch

The Constitution textually commits to Congress the power to raise and support the Army, and to the Executive branch the power to command it. See U.S. Const. Art. 1, § 8, cls. 11-16; U.S. Const. Art. II, § 2; Gilligan v. Morgan, 413 U.S. 1, 10 (1973). However, "it is clear that not even military judgments are completely immune from judicial review." McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1358 (11th Cir. 2007); see also Baker, 369 U.S. at 211 ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."); Gilligan, 413 U.S. at 11-12 ("[I]t should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review.").

Koohi v. United States, 976 F.2d 1328, 1332 (9th Cir. 1992) is the only Ninth Circuit case that addresses the political question issue as it relates to tort claims arising from military activity. The Koohi court concluded that a negligence claim against the United States military and a strict product liability claim against the manufacturers of the military's air defense system for injuries incurred when the Army shot down a misidentified Iranian Airbus

9

carrying civilian passengers did not implicate a political question.  The court found that it was "fully empowered to consider claims . . . resulting from military intrusions into the civilian sector."  Id. at 1331-32 (quoting Laird v. Tatum, 408 U.S. 1, 15-16 (1972)).  The court also explained, "A key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiffs seek only damages [not injunctive relief] for their injuries."  Id. at 1332. Nevertheless, the court dismissed all the claims as barred under the "combatant activities" exception to the Federal Tort Claims Act.  Id. at 1333-36.

Defendants attempt to distinguish the instant case from Koohi by arguing that the passengers on the Chinook helicopter were all soldiers who had voluntarily assumed the risks associated with military activity.  However, although the Ninth Circuit held that "those decisions [which] cause injury to civilians" are "particularly" reviewable, it did not state that injuries to members of the armed forces were necessarily nonjusticiable.  Id. at 1331.  Although Koohi has been interpreted to mean that "civilians injured at the hands of the military do not raise political questions, [but] soldiers injured at the hands of the military raise political questions," Bentzlin v. Hughes Aircraft Co., 833 F. Supp. 1486, 1490 (C.D. Cal. 1993), courts in other jurisdictions have held that claims arising from injuries to soldiers are justiciable.  See e.g., Norwood v. Raytheon Company, 455 F. Supp. 2d 597, 608 (W.D. Tex. 2006); Lessin v. Kellogg, Brown & Root, ___ F. Supp. 2d ___, 2006 WL 3940556, *8 (S.D. Tex. 2006); Carmichael v. Kellogg, Brown & Root Services, Inc., 450 F. Supp. 2d

10

1373, 1376 (N.D. Ga. 2006); McMahon, 502 F.3d at 1331.  Therefore, Plaintiffs' status as soldiers, although relevant, is not dispositive.

At the time Koohi was decided, neither the Supreme Court nor any Court of Appeals had dismissed a suit brought against a private party on the basis of the political question doctrine.  976 F.2d at n.3.  However, as Defendants note, the Ninth Circuit, in Corrie v. Caterpillar, Inc., 503 F.3d 974, 982 (9th Cir. 2007), dismissed as raising a political question a war crimes claim against a private manufacturer who sold bulldozers, funded by the United States government, to the Israel Defense Forces for the purpose of bulldozing homes in the Palestinian Territories.  Therefore, the fact that Defendants are private parties is also not dispositive.

Plaintiffs emphasize that, like the plaintiffs in Koohi, 976 F.2d at 1332, they are requesting monetary damages, rather than injunctive relief.  This fact, too, is relevant, but not dispositive.  Koohi did not hold it dispositive and, as Defendants note, there are cases in this circuit and others that were found nonjusticiable even though the plaintiffs were requesting only monetary damages.  See e.g., Bentzlin, 833 F. Supp. at 148; Atkepe v. United States, 105 F.3d 1400, 1402 (11th Cir. 1997); Whitaker v. Kellogg, Brown & Root, Inc., 444 F. Supp. 2d 1277, 1281 (M.D. Ga. 2006).

Because there are no Ninth Circuit cases addressing the justiciability of soldiers' tort claims against a military contractor, the Court will consider the reasoning of other circuit and district court cases that have decided this issue.  According

11

to the majority of these cases, the key inquiry is whether a court will have to consider the wisdom of military operations and decision-making, or whether it need only consider the private contractor's performance. See McMahon, 502 F.3d at 1358. The court must make this determination by considering both "how the plaintiffs might prove their claims and how [the defendants] would defend." Lane, 2008 WL 2191200 at *12.

The following cases applied this standard, and found that the plaintiffs' claims were nonjusticiable. In Bentzlin, 833 F. Supp. at 1497, a court in the Central District of California dismissed for lack of subject matter jurisdiction a products liability claim brought by families of soldiers against a missile manufacturer arising from the alleged misfiring of an Air Force missile, reasoning that "no trier of fact can reach the issue of manufacturing defect without eliminating other variables which necessarily involve political questions, . . . [such as] military strategy and, more specifically, orders to . . . pilots and ground troops." Similarly, in Smith v. Halliburton, ____ F. Supp. 2d ____, 2006 WL 2521326, *24 (S.D. Tex. 2006), a Texas district court dismissed a negligence claim brought by injured soldiers against a private contractor that arose from a suicide bombing at a military dining hall in Iraq because it would involve evaluation of "the intelligence gathering, risk assessment and security measures implemented by the military" to determine whether the contractor hired to serve food at the facility was responsible for the attack. See also Zuckerbraun v. General Dynamics Corp., 755 F. Supp. 1134, 1142 (D. Conn. 1990) (finding that in order to evaluate the alleged

12

failure of the anti-missile system that the plaintiffs claimed resulted in the deaths of thirty-seven Navy sailors, the court would have to "examine the appropriateness of the rules of engagement and the standing orders, which are committed to the executive branch").

On the other hand, in Norwood, 455 F. Supp. 2d at 604, a Texas district court held that the adjudication of a product liability claim brought by American and German soldiers against a radar manufacturer for injuries which allegedly arose due to the plaintiffs' prolonged exposure to radiation emitted from the system would not implicate military decision-making, because it "would not involve inquiries into rules of engagement [or] reactions of United States servicemen during combat," and "the government contractor defense will likely prevent any scrutiny by the Court of the United States Armed Forces' acquisition and use of the radar system." Similarly, in McMahon, 502 F.3d at 1361, the Eleventh Circuit upheld the district court's finding of no political question, because it found that the court could resolve a soldier's negligence claims against a government contractor hired to provide air transportation during combat missions in Afghanistan without examining "the military's discrete areas of responsibility," which included the "start and end points of the flights, when the flights would be flown . . . the working hours of . . . pilots, . . . minimum requirements for the aircraft, and . . . minimum and maximum amounts of passengers and cargo."

Several courts have been reluctant to dismiss claims at an early stage of discovery before "it is certain whether inquiries

13

into military decision-making would be necessitated by Plaintiff's claims." Carmichael, 450 F. Supp. 2d at 1376 (finding that at the early stage in discovery it was "impossible to say" whether a soldier's negligence claim against an independent government contractor arising from a traffic accident in Iraq would involve a nonjusticiable political question). In Lane, 2008 WL 2191200 at *7, the Fifth Circuit found that although the "plaintiffs' negligence allegations move precariously close to implicating the political question doctrine," the district court should not have dismissed on this ground without some showing that unforeseeable military decision-making rendered the defendant government contractor's actions reasonable in the circumstances. See also Lessin, 2006 WL 3940556 at *8 (finding that although a soldier's injuries occurred during a transport mission in Iraq, the "limited facts" available provided no evidence of the military's contribution to "essentially, a traffic accident, involving a commercial truck . . . as well as a civilian truck driver").

    Here, as in Norwood, 455 F. Supp. 2d at 604, and McMahon, 502 F.3d at 1361, based on the current record, the Court may be able to decide Plaintiffs' claims without considering military decision-making. Although evidence in the record demonstrates that there was icing and low visibility at the time of the crash, there is no evidence that military personnel ordered the aircraft to fly in unfavorable conditions, and, in fact, prior to take-off, two weather forecasts were obtained so that the aircraft would not fly under hazardous conditions. Id., Investigative Findings, 3(c). Moreover, although the military planned the aircraft's route, there

14

is no evidence that this decision contributed to the crash.  The record shows that the aircraft was flying along an "established flight corridor" over a "relatively benign" valley.  <u>Id.</u> at 3(b), 3(a).

Similarly, evidence of the pilot's decision to ascend rather than immediately land the helicopter will not necessarily require consideration of the military's role in training and communicating with its aircrew.  There is as yet no evidence in the record to suggest that the pilot's actions were the result of inadequate training or a lack of communication.  In fact, the Army Investigators found that "highly experienced" pilots could not have landed under similar conditions for a number of plausible reasons.  Finally, unlike in <u>Bentzlin</u>, 833 F. Supp. at 1497, <u>Smith</u>, 2006 WL 2521326 at *24 and <u>Zuckerbraun</u>, 755 F. Supp. at 1142, where the courts found that they would have to examine the enemy and friendly fire that caused the plaintiffs' injuries, here, the record shows "no evidence of enemy or friendly fire."  Army Report, Investigative Findings, 3(a).

Defendants list other hypothetical considerations that may implicate Army decision-making, including the gross weight on the helicopter at the time of the crash, possible violations of standard operating procedure, or modifications that the Army may have made to the helicopter prior to take-off.  As <u>McMahon</u> held, the possibility that military decision-making will be implicated, without evidence to demonstrate its applicability to Plaintiffs' claims or Defendants' defenses, is insufficient to implicate a political question.  <u>See</u> 502 F.3d at 1361.

15

At this point, there is insufficient evidence in the record to demonstrate that the Court will have to consider military activity in adjudicating Plaintiffs' claims.  If Defendants later discover evidence of military decision-making that is inextricably linked to Plaintiffs' claims, the Court will reconsider the first Baker test.  Moreover, if, in the course of discovery, the military refuses to disclose evidence essential to Defendants' defenses, Defendants may move for appropriate relief.

II. Additional Baker Tests

The second Baker test requires that Defendants demonstrate "a lack of judicially discoverable and manageable standards" to resolve Plaintiffs' claims.  Baker, 369 U.S. at 217.  Federal courts do not have the tools to evaluate the "reasonableness" of military decisions, which "result from a complex, subtle balancing of many technical and military considerations, including the trade-off between safety and greater combat effectiveness."  Aktepe, 105 F.3d at 1404.  In particular, "[c]ourts lack standards with which to judge whether reasonable care was taken to achieve tactical objectives in combat while minimizing injury and loss of life."  Zuckerbraun, 755 F. Supp. at 1142.

In Aktepe, the Eleventh Circuit held that there were no judicially manageable standards to "determine how a reasonable military force would have conducted the [training] drill" that resulted in injuries to Turkish sailors.  105 F.3d at 1404.  Similarly, in Whitaker, the court held that it could not assess "what a reasonable driver in a combat zone, subject to military regulations and orders, would do."  444 F. Supp. 2d at 1282.

16

On the other hand, if a court finds that it will not have to evaluate a military decision, but is instead "faced with an ordinary tort suit, alleging that the defendants breached a duty of care owed to the plaintiffs or their decedents . . . the department to whom this issue has been 'constitutionally committed' is none other than our own -- the Judiciary." Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 49 (2nd Cir. 1991). The common law of torts provides "clear and well-settled rules" to resolve ordinary cases between private parties. Id.

While there may be evidence that weather forecasting or pilot error may have contributed to the accident, there is as yet no indication that decision-making particular to the military was implicated. Therefore, at this early stage in discovery, it appears that judicially manageable standards exist for the resolution of Plaintiffs' claims.

The remaining four Baker tests are also not satisfied. Even if it transpires that military decision-making that the Court cannot evaluate is implicated here, it does not appear that this would involve policy or political decisions.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for lack of subject matter jurisdiction (Docket no. 68) is DENIED without prejudice. Because the Court has ruled on Defendants' motion to dismiss, the Court's order granting Defendants' motions for a stay of discovery (Docket no. 69) and a protective order (Docket no. 75) pending the Court's ruling on Defendants' motion to

17

dismiss is hereby VACATED.

    IT IS SO ORDERED.

Dated: 7/8/08

                                          Claudia Wilken
                                          UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California