IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DEBORAH GETZ, et al.,

    Plaintiffs,

   v.

THE BOEING COMPANY, et al.,

    Defendants.

No. C 07-06396 CW

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    Defendants Honeywell International, Inc. (Honeywell), The Boeing Company (Boeing) and Goodrich Pump & Engine Control Systems, Inc. (Goodrich) have filed a motion for summary judgment. Plaintiffs oppose the motion.[1]  Having considered all of the papers filed by the parties and oral argument on January 29, 2008, the Court DENIES Defendants' summary judgment motion.

---

[1] Plaintiffs are thirty-three individuals who either were injured in the helicopter crash that gave rise to this case or were the heirs of individuals killed in the crash:  Deborah Getz, Rodney Thomas, Mary Duffman, Sophia Duffman, Christine Vaughn, Brad Vaughn, Heather Vaughn, Taylin Vaughn, Jill Garbs, Doug Garbs, Paul Wilkinson, Felicia Wilkinson, Tyffanie Wilkinson, Carson Wilkinson, Robert J. Quinlan, Kathleen T. Quinlan, Julie Quinlan, Keely Quinlan, Madeline Quinlan, Erin Quinlan, Hershel McCants, Sr., Goldie Murphy, Shannon McCants, Trevor McCants, Kylie McCants, Jordan Lanham, Jerry Goldsmith, Ryanne Noss, Timothy Brauch, Chris Trisko, Mark Daniel Houghton, Chuck Isaacson and Brenda Isaacson.

BACKGROUND

On February 17, 2007, a United States Army Special Operations Aviation Regiment (SOAR) MH-47E Chinook helicopter bearing Tail #94-00472 crashed in the Zabul Province of Afghanistan. All twenty-two individuals on board the helicopter were military personnel. Plaintiffs are the survivors of the crash and the heirs of the individuals who were killed in the crash. Defendants are companies that designed, assembled, manufactured, inspected, tested, marketed and sold the helicopter, its component parts and related software and hardware.

The following facts regarding the details of the crash are taken from the Army Regulation 15-6 Report of Proceedings by Investigating Office/Board of Officers (Army Report), attached as Exhibit A to the Brandi Declaration submitted in support of Plaintiffs' opposition to Defendants' motion to dismiss. See Docket No. 80. Included in this report are the findings of the Army's Investigative Office (Investigative Findings), as well as numerous attachments, such as aircraft maintenance reports, autopsy reports, weather forecasting data, voice transcripts of pilot communications, aircrew sworn statements and aircraft manual extracts. The Army Report is heavily redacted and uses a number of undefined abbreviations and terms.

SOAR, the unit operating the helicopter at the time of the crash, specializes in low-level night flying during combat and rescue missions. On the day of the accident, the unit was returning to its base in Bagram, Afghanistan along an "established flight corridor" with two other helicopters after a mission to "drop . . . off personnel to capture/kill someone in the Al-Qaeda

2

network" was cancelled. Army Report, Investigative Findings, 3(b); Sworn Witness Statement taken at 11:09, at 1. According to one eyewitness report, when the crew informed their commander that the mission had been cancelled and they were planning to return to base, the commander "agreed that [they] should recover to Bagram." Id., Sworn Statement taken at 14:30, at 1. The helicopter took off after a Performance Planning Card was completed, indicating that the aircraft could perform the mission, and the crew received two favorable weather forecasts. Id., Investigative Findings, 3(c); Sworn Statement taken at 14:30, at 1. Sixty-four minutes into the flight, the aircraft crashed, killing eight and injuring the remaining fourteen people on board. Id., Investigative Findings at 1(a), 2(e).

According to the Army Report, "the preponderance of evidence indicates that the primary cause of the accident was the sudden catastrophic failure of the number two engine." Id. at 1(c). The Army Report's Investigative Findings indicate that "the single remaining operational engine could not provide the power required to maintain sustained flight." Id. However, the MH47E Operator Manual suggests that continued flight may have been possible with only one working engine. Id., MH47E Operator Manual, section 9-2-7. According to the Army Report's findings, the pilot's decision to enter an "avoid" range of 400 feet, rather than to descend to a lower altitude, may have made continued flight impossible. Id., Investigative Findings, at 4(f)(2-3). The Army Report lists a number of possible reasons why the pilot did not descend to a lower altitude, including the fact that he "lost all primary instrumentation in the last few seconds of flight," that

3

the "standby instrument displays [were] poorly located," and that he "had no visual references" because of poor weather conditions. Army Report, Investigative Findings, at 4.

Although the root cause of the helicopter's engine failure has not yet been determined, investigators have ruled out Foreign Object Damage (FOD). Id. at 3(f). Moreover, Army investigators found no evidence of friendly or hostile fire in the "relatively benign . . . valley" over which the helicopter was flying at the time of the crash. Id. at 3(a). Although the Army Report's Investigative Findings rule out icing damage as a possible cause of the accident, the witness reports uniformly mention seeing serious icing on the aircraft right before the crash. Id. at 3(e); Sworn Statement taken at 9:50, at 1 ("I turned my lip light on and discovered icing on the minigun"); Sworn Statement taken at 9:52, at 1 ("I noticed precipitation coming in from the window and trace amounts of icing on the lower FOD screen of the number two engine"); Sworn Statement taken at 10:00, at 6 ("Heavy/severe icing to the point of 'ghost' terrain painted on radar display").

The Army Report also lists several factors that may have contributed to the severity of the accident, including "a potential component and or system failure of the engine fuel system, poor weather (WX) forecasting and monitoring capabilities in Afghanistan, . . . and improper pilot inputs." Id. at 1(c). Witness Reports focus especially on the failure of the weather forecasting in predicting what one passenger called "the worst weather conditions I have encountered in 20 years." Id., Sworn Statement taken at 10:00, at 6. The Army Report's Investigative Findings state that "the unforecast weather requirements were a

4

significant contributing factor and had a profound impact on how the PIC [pilot in command] reacted to the situation." Id., Investigative Findings, at 4(b). The Investigative Findings reported no evidence, however, that "the inaccurate weather forecasts and observations were due to human error." Id. at 3(d).

There is no evidence that the mission was poorly planned or that the unit failed to maintain the equipment properly. Id. at 3(b),(g). The engine was only seven months old, and had shown no signs of weakness in any prior flight crew inspection. Id. at 3(g). However, there had been past reports of other engine failures on Chinook aircraft prior to this incident. Id. at 4(a)(1).

Alleging that the defective design and production of engine number two was the primary cause of the crash, Plaintiffs are seeking monetary damages from Defendants for wrongful death, bodily injuries, and loss of consortium based on the legal theories of negligence, strict product liability, and breach of express and implied warranty.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true

5

1  the opposing party's evidence, if supported by affidavits or other
2  evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815
3  F.2d at 1289.  The court must draw all reasonable inferences in
4  favor of the party against whom summary judgment is sought.
5  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
6  587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d
7  1551, 1558 (9th Cir. 1991).

8  Material facts which would preclude entry of summary judgment
9  are those which, under applicable substantive law, may affect the
10 outcome of the case.  The substantive law will identify which facts
11 are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
12 (1986).

DISCUSSION

14 In Boyle v. United Technologies Corporation, 487 U.S. 500, 512
15 (1988), the Supreme Court held that "state law which holds
16 Government contractors liable for design defects in military
17 equipment does in some circumstances present a 'significant
18 conflict' with federal policy and must be displaced."  The Court
19 described one such circumstance as "when (1) the United States
20 approved reasonably precise specifications; (2) the equipment
21 conformed to those specifications; and (3) the supplier warned the
22 United States about the dangers in the use of the equipment that
23 were known to the supplier but not the United States."  Id.  When
24 these requirements are met a government contractor cannot be held
25 liable under state law.  Id.

26 The Ninth Circuit subsequently addressed whether to extend
27 Boyle to protect government contractors who were sued under state
28 law for design defects in a weapons system under other

6

circumstances.  See Koohi v. United States, 976 F.2d 1328 (9th Cir. 1992).  The incident underlying Koohi took place on July 3, 1988, in the midst of the Iran-Iraq war, after the United States announced that it would protect Kuwaiti ships from attacks by Iran. The USS Vincennes, a naval cruiser equipped with the computerized Aegis air defense system, mistook an Iranian civilian aircraft for an Iranian F-14, and shot down the civilian aircraft.  Id. at 1330. The heirs of some of the deceased passengers and crew alleged claims against the United States for negligent operation of the Vincennes and claims against the weapons manufacturer for design defects in the Aegis system.  Id.

The Ninth Circuit held that the plaintiffs' claims against the United States fell squarely into the combatant activities exception of the Federal Tort Claims Act.  Id. at 1335.  This exception provides that the government does not waive its sovereign immunity from suits regarding "any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war."  28 U.S.C. § 2860(j).  In determining whether the incident in question occurred "during time of war" the court reasoned, "It seems clear that the purpose of the exception we are construing is to ensure that the government will not be liable for negligent conduct by our armed forces in times of combat."  Id. at 1334.  Then the court noted that there are "three principal reasons for the combatant activities exception."  Id.  "First, tort law is based in part on the theory that the prospect of liability makes the actor more careful."  Id.  The court observed that Congress "did not want our soldiers, sailors, or airmen to be concerned about the possibility of tort liability when making life or death

7

decisions in the midst of combat." Id. at 1335.  Second, "tort law is based in part on a desire to secure justice -- to provide a remedy for the innocent victim of wrongful conduct." Id. The court noted that "it would make little sense to single out for special compensation a few of these persons -- usually enemy citizens -- on the basis that they have suffered from the negligence of our military forces rather than from the overwhelming and pervasive violence which each side intentionally inflicts on the other." Id. Third, holding the government liable would not serve the "punitive aspect to tort law." Id. In sum, these three reasons supported the court's conclusion that "tort law, in toto, is an inappropriate subject for injection into the area of military engagements." Id.

The court then turned its attention to the weapons manufacturer, a government contractor. The court first noted that the weapons manufacturer, as a private party, was not entitled to a defense of sovereign immunity. The court continued, "However, the Supreme Court has recognized that the exceptions to the FTCA [Federal Tort Claims Act] may preempt common law tort actions against defense contractors under certain circumstances." Id. at 1336 (citing Boyle, 487 U.S. at 511). Then the court analyzed "whether the plaintiffs' action against the Aegis manufacturers is preempted by the 'combatant activities' exception." Id. The court focused on the fact that "one purpose of the combatant activities exception is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." The court continued,

> While the purpose of the Aegis system may have been, in

8

>     part, to protect the lives of United States servicemen,
>     its purpose surely was not to protect the lives of enemy
>     forces or persons associated with those forces.  Neither
>     the United States nor its defense contractors owed any
>     duty to such individuals.  Because the Iranian Airbus
>     took off from an Iranian joint commercial-military
>     airport, was flying in the area of a combat zone, and
>     failed to communicate its civilian status to the crew of
>     the Vincennes, the direction of force against the
>     aircraft by the United States naval forces cannot give
>     rise to tort liability.  The imposition of such
>     liability on the manufacturers of the Aegis would create
>     a duty of care where the combatant activities exception
>     is intended to ensure that none exists.

Id. at 1337.

Defendants argue that Koohi stands for the broad proposition that the combatant activities exception provides immunity to all government contractors manufacturing military equipment.  The Court disagrees.  Koohi focuses on whether the purposes of tort law would be furthered by requiring weapons manufacturers to extend a duty of care to "enemy forces or persons associated with those forces."  The present case concerns extending the duty of care to United States servicemen, the people the helicopter was designed to protect.  The lack of a duty of care owed to enemies in war does not apply to our own military personnel.

As Koohi noted, the clear purpose of the combatant activities exception "is to ensure that the government will not be liable for negligent conduct by our armed forces in times of combat."  Id. at 1334.  Under Koohi, the Court must determine whether imposing liability on the manufacturers and designers of the subject helicopter would "create a duty of care where the combatant activities exception is intended to ensure that none exists."  Id. at 1337.  To make this determination, the Court examines the three principles underlying the combatant activities exception identified

9

in Koohi.

First, the Court must analyze whether holding a defendant liable in this case would "make the actor more careful." Id. at 1334. In Koohi, the court noted that Congress did not want servicemen to worry about tort liability when "making life or death decisions in the midst of combat." Id. at 1335. Conversely, here, designing and manufacturing an Army combat helicopter should be exercised with great caution so as to provide non-defective products for its intended users.[2]

Second, the Court must analyze whether tort law would "secure justice" and provide a "remedy for the innocent victim of wrongful conduct." Id. In Koohi, the court emphasized that war "produces innumerable innocent victims of harmful conduct -- on all sides," and that it would not make sense to distinguish between victims of negligent and intentional acts by military forces when deciding whether to provide a tort remedy. Id. Here, the military personnel killed were also "innocent victims," but they were not victims of the type of "harmful conduct" contemplated in Koohi. The harmful conduct complained of here arises from an allegedly defective product designed to transport and protect military personnel, not from weapons systems that fired and killed enemy citizens during combat.

Third, the Court must analyze whether the "punitive aspect" of

---

[2] As noted above, Boyle provides government contractors with protection for this activity "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States." Boyle, 487 U.S. at 512. However, Defendants are not moving for summary judgment on the Boyle defense.

10

tort law would be furthered by holding Defendants liable.  Id.  The court in Koohi noted that "it is unlikely that there are many Americans who would favor punishing our servicemen for injuring members of the enemy military or civilian population as a result of actions taken in order to preserve their own lives and limbs."  Id. In contrast, it is unlikely that many Americans would not want to punish companies that provided defective products to the military, when the use of those products resulted in severe injuries and death to their own soldiers.  Therefore, none of the principles underlying the FTCA's combatant activities exception applies to the circumstances of this case.

Defendants also rely heavily on Bentzlin v. Hughes Aircraft Co., 833 F. Supp. 1486 (C.D. Cal. 1993), and Flanigan v. Westwind Technologies, Inc., No. 07-1124, 2008 U.S. Dist. LEXIS 82203 (W.D. Tenn. Sept. 15).  In Bentzlin, family members of Marines who were killed in combat by friendly fire sued a weapons manufacturer, alleging that a manufacturing defect caused the missile to deviate from its intended target and strike the Marines.  Id. at 1487.  The district court analyzed the combatant activities exception and held that a "government contractor who manufacturers the weapons of war cannot be liable for deaths of American soldiers arising from combat activity."  Id. at 1494.  Bentzlin is not binding precedent. The district court in Bentzlin recognized that "Koohi is limited in its precise holding to suits brought by so-called 'enemies' of the United States," but expanded the doctrine beyond the stated holding.

In Flanigan, the pilot of an Apache helicopter was killed when his helicopter crashed in Afghanistan without warning.  2008 U.S.

11

Dist. LEXIS 82203 at *1.  The pilot's widow sued the manufacturers of the helicopter and its component parts alleging that they negligently manufactured these products.  Id. at *2.  The court provided little analysis before concluding that the combatant activities exception preempted the plaintiff's state tort claims.  Id. at *10.  Moreover, Flanigan is also not binding precedent.

The Court concludes that holding Defendants liable for product defects in the subject helicopter would not "create a duty of care where the combatant activities exception is intended to ensure that none exists."  Koohi, 976 F.2d at 1337.  Therefore, the combatant activities exception to the FTCA does not preempt state law in this case.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' motion for summary judgment.  Docket No. 144.

IT IS SO ORDERED.

Dated: 3/10/09

CLAUDIA WILKEN
United States District Judge